NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CAMPBELL SOUP COMPANY, CAMPBELL SALES COMPANY, TRINITY MANUFACTURING, LLC,**
*Appellants*

**v.**

**GAMON PLUS, INC.,**
*Appellee*

---

2020-2322

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-00087.

---

Decided:  August 19, 2021

---

TRACY ZURZOLO QUINN, Holland & Knight LLP, Philadelphia, PA, argued for all appellants.  Appellants Campbell Soup Company, Campbell Sales Company also represented by STEVEN E. JEDLINSKI, Chicago, IL.

MARTIN B. PAVANE, The Davis Firm, Longview, TX, for appellant Trinity Manufacturing, LLC.

ANDREW L. TIAJOLOFF, Tiajoloff & Kelly LLP, New York, NY, argued for appellee.

_____

Before MOORE, *Chief Judge*, PROST and STOLL, *Circuit Judges*.

STOLL, *Circuit Judge*.

This is the second appeal from a final written decision of the Patent Trial and Appeal Board in an *inter partes* review of U.S. Patent No. 8,827,111. On remand to the Board following the first appeal, Campbell Soup Company, Campbell Sales Company, and Trinity Manufacturing, LLC (collectively, "Campbell") and patent owner Gamon Plus, Inc. stipulated to a single asserted ground of obviousness challenging only claims 17, 20, 25, and 26. The Board held that Campbell failed to establish by a preponderance of the evidence that the challenged claims were unpatentable. Because we adopt the Board's construction of the dispositive claim limitation "offset rearwardly," we affirm.

BACKGROUND

I

The '111 patent is directed to a multiple-chute gravity-feed dispenser for storing and dispensing cylindrical objects (like soup cans). '111 patent col. 1 ll. 15–18. The specification explains that gravity-feed dispensers have long been known, but that traditional dispensers have a number of disadvantages. Most importantly for purposes of this appeal, prior art dispensers do not allow customers to easily return unwanted product. Id. at col. 1 ll. 44–45. The specification explains that, "[i]f a customer removes a product and then decides not to purchase [that product], there is nowhere for the customer to replace the product in the gravity feed device" because "[t]he row of product is too heavy for the customer to push back in order to reinsert the unwanted product." *Id.* at col. 1 ll. 45–50. The specification

explains that the invention overcomes this problem by providing "a compact, easy to assemble, easy to load and reload multi-chute gravity feed dispenser having an integrated display." *Id.* at col. 1 ll. 52–54.

Figure 3A of the '111 patent depicts a perspective view of one embodiment of the dispenser:



FIG. 3A

Id. Fig. 3A. The specification explains that "panel 10 includes at least one set of rails 20" which "define a plurality of chutes 22, 24 . . . ." Id. at col. 4 ll. 19–22. "The chutes 22, 24 are defined between adjacent pairs of panels 10 and are of a width slightly greater than the width of products 90 [(e.g., soup cans)] and which allow the products to be stored and dispensed therefrom." Id. at col. 5 ll. 13–17.

Figure 6A shows a side view of an embodiment of the invention with one panel removed:



**FIG. 6A**

*Id.* Fig. 6A. The specification explains that the cans are "loaded into the chutes 22, 24." Id. at col. 6 ll. 52–53. "When the supply of product 90 has been sufficiently depleted . . . , new product 92 must be added." Id. at col. 7 ll. 5–7.

The specification discloses that an "advantage of the present invention is the return area or replace stall 110[,] which is defined between the first and second stops 30 and 34 and a cradle member or ear 112 formed on the panel 10." Id. at col. 7 ll. 49–52. The specification explains that "first stop 30 is located towards the rear of panel 10 in comparison to second stop 34," and the distance between the dispensing ends of chutes 22, 24 "is slightly greater than the diameter of a product[] . . . ." Id. at col. 7 l. 64–col. 8 l. 4. Continuing, the specification states that the "replace stall 110 is further defined as an area in which a product 90 may be replaced if the consumer decides not to purchase." *Id.* at col. 7 ll. 52–54. Thus, if a product needs to be returned to the dispenser display, "the replace stall is available for the consumer rather than the tedious and difficult chore of attempting to [force] the product 90 backwards in the dispenser display while replacing the unwanted product 90." *Id.* at col. 8 ll. 4–8.

For example, in Figure 6A, "a consumer has already re-placed a product 90 which was not purchased." Id. at col. 7 ll. 55–56. Thus, the "next purchaser interested in the prod-uct 90 will then intuitively remove the product 90 from the replace stall 110 first as it is most easily removed." Id. at col. 7 ll. 56–59. The specification touts this as "a signif-icant advantage over the prior art." Id. at col. 8 ll. 8–9.

Claim 17 of the '111 patent is the only independent claim at issue in this appeal. Claim 17 reads as follows, with emphasis added to highlight the disputed "offset rear-wardly" claim limitation:

17.  A display rack comprising:

a plurality of generally cylindrical products all hav-ing substantially equal diameters;

first and second product support structures defin-ing respectively first and second chutes configured for the products to pass therethrough, each chute having a respective forward-facing product loading opening in a generally vertically disposed forward side of the display rack and configured to receive the products loaded into the chutes through the for-ward side, and a respective dispensing opening be-low the product loading opening such that the cylindrical products when placed in the product loading opening proceed by force of gravity through the associated chute to the dispensing opening;

the loading and dispensing openings of the second chute being situated between the loading and dis-pensing openings of the first chute;

a door supported for movement between a substan-tially vertical closed position wherein said door co-vers the product loading openings of both of the chutes and an open position wherein the door does not cover the product loading openings and the cy-lindrical products can be loaded into the chutes,

said door in said closed position having a forwardly disposed face capable of holding a product label or advertising;

wherein the chutes each have a stop structure supported adjacent the respective dispensing opening and blocking movement of the products in the chute beyond said stop structure such that the products must be elevated above the stop structure to be removed from the dispensing opening of the chute; and

wherein the stop structure of the second chute is below a portion of the second product support structure adjacent the loading opening of the second chute and stops the products in the second chute rearward of the loading opening of the second chute, said second chute having a clearance space above the stop structure thereof such that a forwardmost one of the products resting thereagainst can be elevated by a user above the stop structure and removed from the second chute; and

the *stop structure of said second chute* being disposed above the dispensing opening of said first chute a vertical distance and *offset rearwardly from the stop structure of said first chute a horizontal distance greater than the diameter of the products such that a forwardmost product of the products in the first chute can only be properly removed from the first chute, by lifting said forwardmost product up to a level wherein the forwardmost product is at least in part horizontally forward of the dispensing opening of the second chute.*

*Id.* at col. 17 l. 54–col. 18 l. 36 (emphases added).

## II

Campbell filed an IPR petition challenging claims 1–35 of the '111 patent relying on nine grounds of

unpatentability.[1]   The Board instituted review of only claims 1–16, 27, 28, and 32–35 on just three of those grounds. *Campbell Soup Co. v. Gamon Plus, Inc.*, No. IPR2017-00087, Paper 12, at 52 (P.T.A.B. Apr. 21, 2017) (*Institution Decision*). Gamon filed a motion to disclaim claims 1–16, which the Board granted.  In a final written decision, the Board determined that Campbell had not established, by a preponderance of the evidence, that claims 27, 28, and 32–35 of the '111 patent were unpatentable as obvious. *Campbell Soup Co. v. Gamon Plus, Inc.*, No. IPR2017-00087, 2018 WL 2084933, at *27 (P.T.A.B. May 2, 2018) (*Final Written Decision I*).

On appeal, we affirmed the Board's determination that claims 27, 28, and 32–35 were not unpatentable over the instituted grounds. *Campbell Soup Co. v. Gamon Plus, Inc.*, 787 F. App'x 731, 739 (Fed. Cir. 2019).  Nonetheless, in light of *SAS Institute v. Iancu*, 138 S. Ct. 1348 (2018), we remanded for the Board to consider whether claims 17–35 would have been obvious in view of the non-instituted grounds. *Campbell Soup*, 787 F. App'x at 739–40.

On remand, the parties stipulated to a single asserted ground of obviousness challenging only claims 17, 20, 25, and 26.  The parties disagreed on the construction of the "offset rearwardly" phrase found in each of these claims. *Campbell Soup Co. v. Gamon Plus, Inc.*, No. IPR2017-00087, 2020 WL 4236884, at *7 (P.T.A.B. July 23, 2020) (*Final Written Decision II*).  Campbell asserted that "*at least a portion of* the stop structure of the second chute is offset by a distance greater than the diameter of the cylindrical products[] from *at least a portion of* the stop structure of the first chute." *Id.* at *9 (alteration in original)

---

[1]   In fact, the Board identified eighteen unique grounds because many of Campbell's nine numbered grounds included several alternative combinations of references.

(citations omitted).  For its part, Gamon urged the Board to construe the phrase "a horizontal distance" to mean the "horizontal space between [the stop structures]."  *Id.* at *7 (quoting *Institution Decision* at 19–20).

The Board agreed with Gamon and determined that the phrase should be understood according to its plain and ordinary meaning, i.e., that "the horizontal distance recited in this limitation is measured from the end of the first stop structure to the beginning of the second stop structure, as that is the horizontal distance by which the structures are offset."  *Final Written Decision II*, 2020 WL 4236884, at *11.  Relying on the plain claim language, the Board reasoned that "the most reasonable interpretation of one structure being 'offset rearwardly from' another structure is that the offset, i.e., the distance between the structures (their separation), is measured from the rear of the first stop structure to the front of the second stop structure."  *Id.* at *9.

The Board also rejected Campbell's claim differentiation argument.  Campbell relied on dependent claim 18, which recites that "the horizontal distance that the stop structure of the second chute is offset rearwardly from the stop structure of the first chute is sufficient that one of the products removed by a user from the rack can be replaced on the rack supported with the replaced product resting directly on a rearward portion of said forwardmost product in the first chute."  '111 patent col. 18 ll. 37–43.  According to Campbell, because dependent claim 18 added the requirement that the horizontal distance between the end of the first stop structure and the beginning of the second stop structure must be greater than the diameter of the products, independent claim 17 should be read more broadly. The Board was unpersuaded, determining that claim 18 places additional limits on claim 17 and that, even if the claims did have the same claim scope, such a result was merely due to poor claim drafting.

After construing the claim term, the Board determined that Campbell failed to show that the prior art taught the "offset rearwardly" limitation found in all of the claims at issue. Specifically, the Board found that the prior art failed to disclose a horizontal distance between the end of the first stop structure and the beginning of the second stop structure that was greater than the diameter of the can.

Campbell appeals. We have jurisdiction pursuant to 28 U.S.C.§ 1295(a)(4)(A).

## DISCUSSION

On appeal, Campbell challenges the Board's construction of the claim term "offset rearwardly." We review the Board's claim construction de novo where, as here, the Board relied only on evidence intrinsic to the patent. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015); *see also Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016) ("The construction of claim terms based on the claim language, the specification, and the prosecution history are legal determinations.").

We adopt the Board's construction measuring the claimed offset as the space between the stop structures. We find particular support for this construction in the patent specification. The specification explains that an "advantage of *the present invention is* the return area or replace stall 110 which is *defined between the first and second stops 30 and 34* and a cradle member or ear 112 formed on the panel 10." '111 patent col. 7 ll. 49–52 (emphases added). We have previously held similar statements in the specification, such as "the present invention includes," "the present invention is," and "all embodiments of the present invention are," to be clear and unmistakable statements limiting the scope of the claims. *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (collecting cases). In *Luminara*, we explained that where a patentee describes the features of "the present invention," he "implicitly alerts the reader that 'this

description limits the scope of the invention.'" *Id.* (quoting *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013)). We further held that by teaching that the present invention solved a particular problem in the prior art (imitating a "real flame") with a specific feature ("chaotic movements"), the patentee disclaimed devices that failed to include that specific feature (e.g., by using "rhythmic or metronomic patterns"). *Id.* at 1353–54.

Here, in addition to indicating that an advantage of "the present invention" is the return area, the specification repeatedly emphasizes the importance of the return area to the invention and defines the return area as the distance between the first and second stops that is slightly greater than the diameter of the can. In particular, the detailed description explains that an advantage of the present invention is that it has a return area. *See* '111 patent col. 7 ll. 49–52; *see also id.* at col. 1 ll. 44–45. It goes on to explain that the distance between the dispensing ends of the first chute and the second chute "is slightly greater than the diameter of a products 90 unit." *Id.* at col. 7 l. 64–col. 8 l. 4. In this way, if a "product is then returned to the dispenser display, the replace stall is available for the consumer rather than the tedious and difficult chore of attempting to [force] the product 90 backwards in the dispenser display while replacing the unwanted product 90." *Id.* at col. 8 ll. 4–8. Finally, the specification states that "[t]his represents a significant advantage over the prior art." *Id.* at col. 8 ll. 8–9. Given the clear and unambiguous statements in the specification, we conclude that the Board did not err in its claim construction. Indeed, were the claims interpreted as Campbell urges, the claims would cover dispenser displays that lack the return area described as part of "the present invention" and touted as advantageous over the prior art.

We are unpersuaded by Campbell's assertion that reference to "the present invention" in this case does not amount to disavowal. *See* Oral Arg. at 22:07–23:58,

http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20-2322_06072021.mp3.  We have held that use of the phrase "present invention" did not amount to disavowal, but only when the intrinsic record is inconsistent with the disclaimer.

For instance, in *Continental Circuits LLC v. Intel Corporation*, we determined that reference to "the present invention" did not amount to disavowal where the phrase described only "one way to carry out the present invention" and where "the specification d[id] not uniformly require [the limiting feature]."  915 F.3d 788, 798 (Fed. Cir. 2019) (citing *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136–37 (Fed. Cir. 2011)).  Likewise, in *Absolute Software*, we determined that reciting "the present invention" did not amount to disavowal where the specification did not uniformly require the limiting feature.  659 F.3d at 1136–37.  There, the specification made clear that the features were merely "*optional* features of the 'present invention.'"  *Id.* at 1137.  Thus, we explained that "the specification use[d] 'present invention' in a way that expressly contradict[ed] earlier references to 'present invention' . . . ."  *Id.*  Finally, in *Rambus Inc. v. Infineon Technologies AG*, we determined that reference in the specification to "the present invention" did not limit a "bus" to a "multiplexing bus."  318 F.3d 1081, 1094–95 (Fed. Cir. 2003).  There, "the prosecution history show[ed] that a multiplexing bus [was] only one of many inventions disclosed in the [patent] application."  *Id.*  Indeed, during prosecution, the Examiner issued a restriction requirement between claims directed to a "multiplexing bus group" and a "latency invention group," with the patent applicant electing to prosecute the latter group.  *Id.* at 1095.  Accordingly, we determined that the prosecution history showed that the invention of the patent at issue was not limited to a multiplexing bus.  *Id.*

Unlike in *Continental Circuits*, *Absolute Software*, and *Rambus*, we see nothing in the intrinsic record that

indicates that the return area is not uniformly required. Indeed, the opposite is true. The specification ascribes significant weight to the advantages of the return area. Further, we do not see anywhere in the specification or the prosecution history that contemplates an embodiment without a return area. Accordingly, because the return area is described in the specification as part of "the present invention" itself, we conclude that the claims are not entitled to a scope broader than that embodiment. *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) ("[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment." (quoting *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1379 (Fed. Cir. 2005))).

Campbell's reliance on claim differentiation and dependent claim 18 is also unavailing. The doctrine of claim differentiation "is 'not a hard and fast rule[,]'" *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008) (quoting *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005)), and "does not serve to broaden claims beyond their meaning in light of the specification[,]" *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1326 (Fed. Cir. 2017) (quoting *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1302 (Fed. Cir. 1999)). When faced with clear and unambiguous language in the specification and a claim differentiation argument, the specification must prevail. *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) ("[T]he doctrine of claim differentiation . . . can be overcome by strong contrary evidence such as definitional language in the patent or a clear disavowal of claim scope.").

Campbell does not challenge the Board's obviousness determination under the Board's construction of the term "offset rearwardly." Thus, because we adopt the Board's construction of that term, we affirm.

CONCLUSION

We have considered the parties' remaining arguments, but we do not find them persuasive. For the foregoing reasons, we adopt the Board's construction and affirm the Board's final written decision.

**AFFIRMED**