# United States Court of Appeals
# for the Federal Circuit

---

**LUMINARA WORLDWIDE, LLC,**
*Plaintiff-Appellee*

**v.**

**LIOWN ELECTRONICS CO. LTD., LIOWN
TECHNOLOGIES/BEAUTY ELECTRONICS, LLC,
SHENZHEN LIOWN ELECTRONICS CO. LTD.,
BOSTON WAREHOUSE TRADING CORP., ABBOTT
OF ENGLAND (1981), LTD., BJ'S WHOLESALE
CLUB, INC., VON MAUR, INC., ZULILY, INC.,
SMART CANDLE, LLC, TUESDAY MORNING
CORP., THE LIGHT GARDEN, INC., CENTRAL
GARDEN & PET COMPANY,**
*Defendants-Appellants*

**AMBIENT LIGHTING, INC.,**
*Defendant*

---

2015-1671

---

Appeal from the United States District Court for the District of Minnesota in No. 0:14-cv-03103-SRN-FLN, Judge Susan Richard Nelson.

---

Decided: February 29, 2016

---

JON WRIGHT, Sterne Kessler Goldstein & Fox, PLLC, Washington, DC, argued for plaintiff-appellee. Also represented by DAVID K.S. CORNWELL, RICHARD D. COLLER, III; COURTLAND COLLINSON MERRILL, DANIEL RYAN HALL, Anthony Ostlund Baer & Louwagie P.A., Minneapolis, MN.

DAN L. BAGATELL, Perkins Coie LLP, Phoenix, AZ, argued for all appellants. Defendants-appellants Liown Electronics Co. Ltd., Liown Technologies/Beauty Electronics, LLC, Shenzhen Liown Electronics Co. Ltd. also represented by KENNETH J. HALPERN, Palo Alto, CA; JOSEPH P. REID, THOMAS N. MILLIKAN, San Diego, CA.

ALAN GARY CARLSON, Carlson, Caspers, Vandenburgh, Lindquist & Schuman, P.A., Minneapolis, MN, for defendants-appellants BJ's Wholesale Club, Inc., Central Garden & Pet Company. Also represented by TARA CATHERINE NORGARD.

---

Before MOORE, O'MALLEY, and TARANTO, *Circuit Judges.*

MOORE, *Circuit Judge.*

Appellants Liown Electronics Co.; Shenzhen Liown Electronics Co.; and Liown Technologies/Beauty Electronics, LLC (collectively, "Liown"), and enjoined distributors Boston Warehouse Trading Corp.; Abbott of England (1981), Ltd.; BJ's Wholesale Club., Inc.; Von Maur, Inc.; Zulily, Inc.; Smart Candle, LLC; Tuesday Morning Corp.; Ambient Lighting, Inc.; The Light Garden, Inc.; and Central Garden & Pet Co. (collectively, "Distributors") appeal from the district court's grant of a preliminary injunction barring Liown from supplying Distributors with artificial candle products that infringe Disney Enterprises, Inc.'s U.S. Patent No. 8,696,166. We vacate and remand for further proceedings.

## BACKGROUND

The patents asserted in this case—the '166 patent and U.S. Patent Nos. 7,837,355; 8,070,319; and 8,534,869—teach improved techniques for making the light from artificial candles flicker like the flames of real candles. These techniques were first developed for the "Haunted Mansion" ride at Disneyland. Disney Enterprises, Inc., a wholly-owned subsidiary of The Walt Disney Company, is the owner of the asserted patents, which claim priority to 2008.

In 2008, Disney Enterprises granted Candella, LLC,[1] a four-year worldwide license to "make, have made, use, sell, offer for [sale], and import" products practicing "Artificial Flame Technology," which was defined to include Disney's patents and know-how relating to "creating a unique artificial flickering flame effect." J.A. 368, 370. In May 2012, Disney Enterprises and Candella renewed the license until 2020 on similar terms. The original terms of the license restricted Candella's rights to the Artificial Flame Technology in several ways. For example, Candella could not assign, sublicense, or transfer ownership of its rights without Disney's consent, nor could Candella sue to enforce the patents or settle litigation without Disney's consent.

The dispute between the parties in this case stems from early 2010, when Candella first approached Liown to manufacture its candles. Negotiations between the companies soon broke down, and Liown subsequently filed a patent application in China on flameless candles. Allegedly, Liown based this application on confidential information about the Artificial Flame Technology it

---

[1]     Candella, the former plaintiff in this case, merged in late 2014 with Luminara Worldwide, LLC, the party bringing this appeal.

obtained during its negotiations with Candella.  In 2012, Liown began selling its flameless candles in the United States.

On October 31, 2012, Disney Enterprises and Candella amended the license agreement to grant Candella more rights, including (1) the right to sublicense its interest in the Artificial Flame Technology according to the terms of the license agreement; (2) the right to assign its interest with Disney's consent, not to be withheld unreasonably; and (3) the right to sue without Disney's consent.  J.A. 439–46 ("2012 Amendment").  The license agreement has since been amended three more times, each time to grant Candella more rights in the Artificial Flame Technology.  On July 26, 2013, Disney Enterprises and Candella amended the agreement to give Candella the option of extending the agreement in successive periods until six years after the expiration of the last of the licensed patents.  On December 20, 2013, Disney Enterprises and Candella amended the agreement to give Candella the right to select and retain counsel to respond to any petition for post grant review or reexamination of the licensed patents.  And on September 9, 2014, Disney Enterprises and Candella amended the agreement to give Candella rights to additional patents.  We refer to the license agreement, as amended by all four amendments, as the "Amended Agreement."

Two days after the 2012 Amendment, Candella sued Liown for patent infringement.  The parties settled, and Liown agreed to stop selling infringing candles in the United States.  Following the settlement, Candella and Liown reopened negotiations for Liown to manufacture flameless candles having the Artificial Flame Technology.  However, the relationship again deteriorated.  Days after receiving its own U.S. patent covering similar artificial flame technology, Liown advised Candella that it would no longer comply with the terms of the settlement agreement.  Liown then allegedly began selling its own flame-

less candles to Candella's exclusive customers based on information it learned about those customers in the period after the settlement proceedings.

Candella again filed suit against Liown, alleging patent infringement, tortious interference, and trademark infringement. After filing this suit, Candella merged into Luminara. Luminara now possesses all of the rights formerly held by Candella.

Shortly after the suit was filed, Liown moved to dismiss for lack of standing. The district court denied Liown's motion, finding that Luminara had both constitutional and prudential standing. *Luminara Worldwide, LLC v. Liown Elecs. Co.*, No. 14-CV-3103 SRN/FLN (D. Minn. Apr. 3, 2015), ECF No. 143; J.A. 1–59 ("Standing Order"). Luminara moved for a preliminary injunction based on Liown's alleged infringement of claim 1 of the '166 patent and Liown's alleged tortious interference with Luminara's customers. The court granted Luminara's motion based on the alleged infringement without reaching the alternative ground of tortious interference. *Luminara Worldwide, LLC v. Liown Elecs. Co.*, No. 14-CV-3103 SRN/FLN, 2015 WL 1967250 (D. Minn. May 1, 2015), ECF No. 147; J.A. 60–114 ("Preliminary Injunction Order"), *order clarified by Luminara Worldwide, LLC v. Liown Elecs. Co.*, No. 14-CV-3103 SRN/FLN, 2015 WL 3559273 (D. Minn. May 22, 2015), ECF No. 210; J.A. 115–48 ("Clarification Order"). Liown appealed, challenging the court's holding that Luminara had standing to bring the suit and its grant of a preliminary injunction. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

### I.   Disney Has Not Retained the Right to License the Patent Through the "Affiliate" Clause

Under our precedent, only parties with exclusionary rights to a patent may bring suit for patent infringement.

*See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007); *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264–65 (Fed. Cir. 2010). The Amended Agreement sets out the scope of Candella's rights to the Artificial Flame Technology; thus, we look to it to determine whether Candella had exclusionary rights to the asserted patents at the time this suit was filed. California law governs the interpretation of the Amended Agreement. Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. We review the district court's interpretation of a contract de novo. *DVD Copy Control Ass'n v. Kaleidescape, Inc.*, 97 Cal. Rptr. 3d 856, 869 (Cal. Ct. App. 2009).

Liown argues that Candella does not have exclusionary rights to the asserted patents because Disney retained the right to freely license the technology to any entity by creating new Affiliates. In § 2.2 of the Amended Agreement, Disney Enterprises retained the right for its Affiliates to practice the Artificial Flame Technology:

> *Reservation of Rights.* Notwithstanding the exclusive license grant above, Disney expressly reserves for itself and its Affiliates the right throughout the world to make, have made, use, sell, offer for sale and import the Licensed Products, within and outside the Product Categories.

J.A. 422. Thus, whether Candella could bring suit for patent infringement turns on the interpretation of Affiliate in the Amended Agreement. If Disney Enterprises could indeed license any entity to manufacture and sell candles having Artificial Flame Technology, Candella would not have had exclusionary rights to the asserted patents. However, if Disney Enterprises did not retain the effective right to license the Artificial Flame Technology to any entity through the Affiliate provision, Candella

would have had exclusionary rights, and therefore could sue to prevent Liown from infringing the asserted patents.

Section 1 of the Amended Agreement defines "Affiliate" as:

> *"Affiliate"* means any entity controlling or controlled by or in common control with a Party, where "control" is defined as the ownership of at least 50% of the equity or beneficial interest of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity. For purposes of this Agreement, a Licensor Affiliate shall include: (1) any other entity with respect to which Licensor or any of its Affiliates has management or operational responsibility (even though Licensor or its Affiliate may own less than 50% of the equity of such entity); and (2) any other entity, theme park, or venue operated by or under license from The Walt Disney Company or any of its Affiliates.

J.A. 420. This provision lays out three categories of Disney Enterprises' Affiliates. First, an Affiliate can be "any entity controlling or controlled by or in common control with" Disney Enterprises. J.A. 420. Second, a Disney Enterprises Affiliate includes "any other entity with respect to which [Disney Enterprises] or any of its Affiliates has management or operational responsibility (even though [Disney Enterprises] or its Affiliate may own less than 50% of the equity of such entity)." J.A. 420. And third, a Disney Enterprises Affiliate includes "any other entity, theme park, or venue operated by or under license from The Walt Disney Company or any of its Affiliates." J.A. 420.

Liown does not argue that Disney Enterprises can freely create Affiliates through the first two of these categories, both of which require Disney Enterprises to

have management or operational control over the Affiliate. Instead, Liown points to the third category, which defines Affiliate to include any entity "operated by or *under license from* The Walt Disney Company or any of its Affiliates." J.A. 420 (emphasis added). Liown contends that any entity "under license" from Disney Enterprises can practice the patent as an Affiliate, effectively allowing Disney Enterprises to freely license the patent.[2] It argues that this provision only requires Affiliates to obtain a license to the Artificial Flame Technology with "any other technology . . . no matter how trivial that technology may be and no matter whether the licensee pays any extra consideration for the additional technology." Appellants' Br. 32–33. It argues there is no explicit requirement for Disney Enterprises to have operational or management control over Affiliates that operate under license from it. In support of its interpretation, it points to § 2.2 of the Amended Agreement, which provides:

> For purposes of this section 2.2 the term "Affiliate" does not include an entity operated under license from the Walt Disney Company where such license is only a license to Artificial Flame Technology.

J.A. 422. It argues that the fact that the Amended Agreement explicitly excludes an entity operated under a license to the Artificial Flame Technology from the definition of Affiliate "necessarily implies that Disney *may* license any entity to use Artificial Flame Technology . . . when any other technology *is* included within the license." Appellants' Br. 32.

---

[2] As a wholly owned subsidiary of The Walt Disney Company, Disney Enterprises is one of The Walt Disney Company's Affiliates. As a result, an Affiliate may fall under this provision if it were operated by or under license from Disney Enterprises.

Like the district court, we conclude that "Affiliate" does not have the broad meaning that Liown claims. The first two categories of Affiliates require operational control, as does the "operated by" provision in the third category. And the plain language of the "operated . . . under license" provision requires the license to relate to the operation of the Affiliate in some way, such as with a franchise agreement. Moreover, the Amended Agreement repeatedly states that Candella would have "exclusive" rights to the Artificial Flame Technology. *See* J.A. 422 §§ 2.1, 2.2; J.A. 440, art. 2(a), 2(b); J.A. 441, art. 2(c), 2(d); J.A. 608, art. 2(a); J.A. 614, art. 2(a). If Disney Enterprises could license the Artificial Flame Technology to any other entity merely by licensing some additional technology to that entity, Candella's promise of an "exclusive" license would be a fiction.

Candella and Disney Enterprises amended their original license agreement four times. Each time, Disney Enterprises gave Candella more rights to the Artificial Flame Technology. Liown itself avers that the parties' intent in agreeing to the 2012 Amendment was to "confer standing on Candella," and thereby allow it to bring suit against Liown. Appellants' Br. 13. Any interpretation of the Amended Agreement that permits Disney Enterprises to license any entity as an Affiliate, such that it can freely practice the Artificial Flame Technology, runs counter to the parties' intent as expressed in the Amended Agreement. We hold that Candella had exclusionary rights to the Artificial Flame Technology when this suit was brought. Disney did not retain the broad licensing rights proposed by Liown.

Liown's next standing argument is that Disney retained substantial rights which prevent Luminara from bringing suit in its own name without joining Disney. If a party (exclusive licensee) has "all substantial rights" to a patent, it "may be deemed the effective 'patentee' under 35 U.S.C. § 281," and thus may maintain an infringement

suit in its own name, without joining the patentee. *Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000). If not, however, an exclusive licensee must join the patentee to bring suit.[3] This joinder requirement exists for two reasons. First, joinder protects the alleged infringer from facing multiple lawsuits on the same patent. *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1343 (Fed. Cir. 2006). Second, joinder protects the patentee from losing substantial rights if its patent claims are invalidated or the patent rendered unenforceable in an action in which it did not participate. *Id.*

Because one purpose of the joinder requirement is to protect the alleged infringer from multiple lawsuits, the transfer of the right to sue for infringement is critical. *See Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1361 (Fed. Cir. 2010) (explaining that the right to sue is frequently "the most important consideration"); *Aspex Eyewear*, 434 F.3d at 1342 (describing the right to sue as "[a] key factor"). If the patentee retains the right to sue, the infringer could face multiple suits for the same alleged infringement—in one suit defending itself against the patentee, and in another defending itself against the exclusive licensee. To prevent this, we require joinder of the patentee if it has retained the right to sue for infringement.

Disney Enterprises has not retained the right to sue here. Instead, Luminara has the "sole and exclusive right" to sue infringers of the patents-in-suit under the Amended Agreement. J.A. 608, 614. Thus, Disney Enterprises need not be joined to protect Liown against the possibility of facing multiple lawsuits on the same patent.

---

[3]   We have commonly referred to this concept as "prudential standing." *See, e.g.*, *Prima Tek II*, 222 F.3d at 1377.

The second purpose of joinder is to protect the patentee from losing substantial rights if its claims are invalidated or the patent is rendered unenforceable in an action in which it did not participate. *Aspex Eyewear*, 434 F.3d at 1343. Thus, an exclusive licensee that does not have "all substantial rights" to a patent must join the patentee to bring suit. For example, if the patentee has retained the right to freely license the patent, it stands to lose substantial rights if the claims are held invalid or the patent held unenforceable. Other considerations include:

> the scope of the licensee's right to sublicense, the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement, the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee, the duration of the license rights granted to the licensee, the ability of the licensor to supervise and control the licensee's activities, the obligation of the licensor to continue paying patent maintenance fees, and the nature of any limits on the licensee's right to assign its interests in the patent.

*Mann Found.*, 604 F.3d at 1360–61.

Luminara has extensive rights under the Amended Agreement, including its exclusionary rights. It has a worldwide license to "make, have made, use, sell, offer for [sale], and import" products practicing the Artificial Flame Technology. J.A. 422. It has the sole right to sublicense the asserted patents—Disney Enterprises did not retain the right to license the asserted patents through the "Affiliate" provision, as discussed *supra* pp. 6–10. And it has the reasonable right to assign its rights under the Amended Agreement.

The rights that Liown argues Disney Enterprises retains are: the right for Disney Enterprises and its Affiliates to practice the patents; title to the patents; the

responsibility to pay maintenance fees to keep the patents in force; a financial interest in litigation and licensing; and a right to notice of litigation and licensing activities.[4]

None of these retained rights individually or cumulatively are substantial enough to preclude Luminara from bringing suit in its name alone. Although Disney Enterprises retains the right for it and its Affiliates to practice the patents, this is not a substantial right requiring joinder. This is because Disney Enterprises will not lose this right if the claims are invalidated or the patent held unenforceable. Rather, if the claims were invalidated or the patent held unenforceable, *everyone*, including Disney Enterprises and its Affiliates, could freely practice the patent. A patentee that merely retains the right to practice the patent does not risk *losing* a substantial right if the claims are invalidated or the patent held unenforceable. The retained right to practice a patent is not the same as a retained right to exclude others from doing so.

We have previously held that a financial interest in litigation and licensing without more does not amount to a substantial right forcing joinder of the patentee. *See, e.g.*, *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1191 (Fed. Cir. 2007) ("[T]he fact that a patent owner has retained a right to a portion of the proceeds of the commercial exploitation of the patent, . . . does not necessarily defeat what would otherwise be a transfer of all substantial rights in the patent."); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SpA*, 944 F.2d 870, 875 (Fed. Cir. 1991) (holding that "a right to receive infringement damages" was not "so substantial as to reduce the transfer to a mere license or indicate an intent not to transfer all substantial rights"). And title to the patents, the responsibility to pay maintenance fees on the patents, and a

---

[4]   This decision is limited to these rights argued by Liown.

right to notice of litigation and licensing activities are not substantial rights that the patentee risks losing if the claims are invalidated or the patent held unenforceable.

We hold that Luminara has all substantial rights to the patent and therefore it is not necessary to join Disney Enterprises in this lawsuit.  Thus, we reject the standing arguments raised by Liown.[5]

## II.    Preliminary Injunction

We review the grant of a preliminary injunction for abuse of discretion.  *Amazon.com Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).  To

---

[5]    We note that the same facts upon which we rely to conclude that Luminara can proceed in the absence of Disney also support a finding that Disney is not an indispensable party within the meaning of Rule 19 of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 19(a).  The Advisory Committee Notes to Rule 19 discuss the concerns that Rule 19 is intended to address:

> The first factor brings in a consideration of what a judgment in the action would mean to the absentee.  Would the absentee be adversely affected in a practical sense, and if so, would the prejudice be immediate and serious, or remote and minor?  The possible collateral consequences of the judgment upon the parties already joined are also to be appraised.  Would any party be exposed to a fresh action by the absentee, and if so, how serious is the threat?

Fed. R. Civ. Pro. 19 advisory committee's note (1966) (citing *A. L. Smith Iron Co. v. Dickson*, 141 F.2d 3 (2d Cir. 1944); *Caldwell Mfg. Co. v. Unique Balance Co.*, 18 F.R.D. 258 (S.D.N.Y. 1955)).  These are the very factors we consider here.

obtain a preliminary injunction, a party must show "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Furthermore, a patentee must establish a causal nexus between the infringement and the alleged harm. *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012). We review claim construction de novo except for subsidiary facts based on extrinsic evidence, which we review for clear error. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841–42 (2015).

Liown argues that the preliminary injunction was improperly granted because there is a substantial question of validity—namely, whether Disney Enterprises' earlier U.S. Patent No. 7,261,455 anticipates claim 1 of the '166 patent. We agree.

Although Luminara alleges infringement of four patents in this suit, claim 1 of the '166 patent forms the sole basis for the district court's grant of a preliminary injunction. Claim 1 recites (emphasis added):

A pendulum member for generating a flickering flame effect, comprising:

a body with upper and lower portions;

a flame silhouette element extending outward from the upper portion of the body; and

a hole in the body below the flame silhouette element, wherein the hole is configured to receive a flame support element such that the flame support element passes through the hole and *the body is free to pivot when supported by the flame support element.*

The '455 patent is also directed to artificial flame technology.  This patent teaches a flame element above a supporting two-axis gimbal, such that the flame element may rotate around two axes.  The parties agree that the '455 patent discloses every element of claim 1 of the '166 patent except the requirement that "the body is free to pivot when supported by the flame support element."  But the parties dispute whether rotation around two axes using gimbals (as taught in the '455 patent) satisfies this limitation.

In considering whether there is a substantial question of invalidity, the district court construed "free to pivot" to mean "to run on, or as if on, a pivot." *Preliminary Injunction Order* at \*6.  The district court then wrote that the specification teaches that the pendulum described in claim 1 of the '166 patent "is suspended using a V-shaped wire passing through a larger hole." *Id.* at \*11.  This "relatively loose suspension allows the pendulum to rotate around three axes" and "slide along the wire," among other movements. *Id.*  The court concluded that the pendulum "moves in at least four different ways, and moves in a random, unpredictable manner." *Id.*  Because the '455 patent teaches a body that moves in only two ways (that is, rotates around only two axes), the court held that it did not satisfy the "free to pivot" limitation. *Id.* at \*11–12.  In essence, the district court construed "free to pivot" to include two additional limitations: (1) chaotic movement and (2) movement that is more than rotation around two axes.

The ordinary meaning of "free to pivot" does not plainly require either of these limitations.  Pivoting includes rotation around a single axis—for example, when a door pivots on its hinges, a dancer turns on a pivot foot, or a lever pivots on a fulcrum.  And being "free to pivot" does not require chaotic motion.

Absent lexicography or disavowal, we do not depart from the plain meaning of the claims. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The standards for finding lexicography and disavowal are "exacting." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). To act as a lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to redefine the term." *Thorner*, 669 F.3d at 1365 (internal quotation marks omitted). Similarly, disavowal requires that "the specification [or prosecution history] make[] clear that the invention does not include a particular feature." *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). While such disavowal can occur either explicitly or implicitly, it must be clear and unmistakable. *See Trs. of Columbia Univ. v. Symantec Corp.*, No. 2015-1146, 2016 WL 386068, at *2–3 (Fed. Cir. Feb. 2, 2016). We have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as "the present invention includes . . ." or "the present invention is . . . " or "all embodiments of the present invention are . . . ." *See, e.g.*, *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1316–19 (Fed. Cir. 2006); *SciMed Life Sys., Inc.*, 242 F.3d at 1343–44. When a patentee "describes the features of the 'present invention' as a whole," he implicitly alerts the reader that "this description limits the scope of the invention." *Regents of the Univ. of Minn.*, 717 F.3d at 936.

At this preliminary stage, we see no definition and no disavowal or disclaimer in the specification requiring motion in four different ways or directions. Certainly, the specification teaches that in some embodiments, the body has a hole that is larger than the diameter of the supporting wire, allowing it to move side-to-side and to rotate around the support element. '166 patent, col. 7 ll. 22–35.

However, the specification also teaches that in other embodiments, it is preferable to have a rigid or semi-rigid support element—not a wire. *Id.* at col. 7 ll. 35–37. In these embodiments, the body would rotate around the support elements, but would not flutter or move side-to-side or in the other ways required by the district court. Thus, the specification teaches that non-rotational motion is optional. We have been shown no prosecution history that is to the contrary. As a result, we see no basis for departing from the plain meaning of the term "free to pivot."

By contrast, the specification disclaims non-chaotic pivoting. It explains that solitary flames are "complex kinetic interactions" that "produce a continuously and randomly moving light." '166 patent, col. 1 ll. 39–41. It teaches that flame displays in the prior art "are relatively poor imitations of a real flame and have not been widely adopted by the commercial or retail markets." *Id.* at col. 2 ll. 13–16. The specification further explains that "[t]he present description addresses the above and other problems by providing kinetic flame devices that create lighting effects driven by *real but chaotic physical movements*." *Id.* at col. 2 ll. 23–25 (emphasis added); *see also id.* at col. 4 ll. 52–58 ("The present description involves devices that create lighting effects driven by real, chaotic, and physical movements."), col. 4 l. 62–col. 5 l. 2 ("[T]he present invention stimulates and/or perturbs a complex interaction between gravity, mass, electromagnetic field strength, magnetic fields, air resistance, and light, but the complex interaction is not directly modulated or controlled."). By teaching that the "present description" solves the problems associated with the prior art candle devices because it is driven by "real but chaotic movements," the patentee disclaims devices driven by rhythmic or metronomic patterns.

Thus, we preliminarily construe claim 1 of the '166 patent to require chaotic pivoting, with no further re-

quirements on movement. The '455 patent undisputedly teaches pivoting in two axes. Furthermore, the '455 patent teaches that the flame reflector, balanced on a gimbal mechanism allowing movement on a minimum of two axes, is "articulated by a natural and chaotic external or internal force (such as wind, magnetism)" to "randomly simulat[e] blowing in the wind." '455 patent, col. 6 ll. 53–62 (J.A. 1410). The final limitation in claim 1 of the '166 patent—chaotic movement—seems to be met with this discussion of chaotic forces that can articulate the flame reflector of the candle device in the prior art '455 patent. As a result, we conclude that Liown's argument that the '455 patent anticipates claim 1 of the '166 patent raises a substantial question of validity.

Luminara asks us to maintain the preliminary injunction on the basis of its claim for tortious interference or on the basis of Liown and the Distributors' infringement of other patent claims (such as claim 14 of the '166 patent) not decided by the district court. We will not consider these claims in the first instance on appeal; however, nothing in this opinion should be taken to prejudice these arguments. Our analysis as to whether there is a substantial question of validity is limited to claim 1 of the '166 patent, the only claim upon which the district court based the preliminary injunction. And to be clear, this holding is based on our preliminary claim construction ruling.

## CONCLUSION

We vacate the district court's grant of a preliminary injunction and remand for further proceedings.

## VACATED AND REMANDED

### COSTS

Costs to Luminara.